245 So.2d 94 (1971)
Howard WHITEHEAD, Appellant,
v.
STATE of Florida, Appellee.
No. 70-241.
District Court of Appeal of Florida, Second District.
February 19, 1971.
Rehearing Denied March 22, 1971.
*95 Jack R. Schoonover, Port Charlotte, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Warren H. Petersen, Asst. Atty. Gen., Lakeland, for appellee.
McNULTY, Judge.
Appellant was convicted of second degree murder in the shooting death of "Rocky" Doss and appeals. We reverse.
It undisputedly appears that appellant was a rancher in Lee County and was also, apparently, in the land clearing and road building business. "Rocky" was one of his employees, as was one Lynn Grant who lived in a trailer on appellant's ranch.
On the night of the tragedy the deceased's 14 year old stepdaughter, Kim, had been babysitting for Grant's children at the aforementioned trailer while Grant was visiting "Rocky" in the latter's home about a mile away. A cousin of Grant's, Joe Johnson, was also a visitor at the deceased's house and there had been quite a bit of drinking by everyone. Concerning events which followed, Grant testified for the state as follows:
"A  Me and Rocky was in the yard talking. Joe said he was leaving. Rocky said, `Well, I bet he goes over to see my daughter.' So we were standing there in the yard watching him. Instead of Joe turning to the left, he turned back to the right and went towards my home, where his daughter was staying. We got in the car and followed him over there.
* * * * * *
When we got there, to Joe, he was standing in the door of his truck at my trailer. I told Rocky that I'd talk to him and tell him to leave, and I was talking to him, and Rocky  and we were arguing. Joe was pretty loaded and he wasn't listening and I had ahold of him. Rocky come up from behind me and hit him, and I turned around and shoved Rocky away from him and told him there wasn't no sense to start no fight. Just about the time that I was shoving Rocky back, I heard a shot from a shotgun and heard Mr. Whitehead holler. I don't know exactly what he hollered, but I told them, I said, `Here comes Howard. Let's straighten up. We don't want no trouble.' And then Howard shot the gun again. I walked out to where Howard was coming down the road and tried to stop him, talk to him, you know, tell him everything was okay. About that time Joe come up and was telling Howard that I was holding him down and Rocky was beating on him, and Howard was telling me to stay back and I was trying to tell him everything was okay, and Howard hit me across the neck with the shotgun and knocked me down. When I got up, Rocky was on the ground and Howard was standing with his gun in his hand and saying, `Well, he's dead.' And about that time Mrs. Whitehead come up, and Howard turned to her and told her to go call the law, that he had killed Rocky.
Q  Did you see how it came about that Rocky got killed, or died?
A  Sir?
Q  Did you see how Rocky died?
A  No, sir. He was behind me."
* * * * * *
Joe Johnson also testified for the state substantially corroborating Grant as far as the latter went. But he supplemented Grant's testimony as to the actual killing of "Rocky" as follows:
"Q  All right, after Lynn told Howard Whitehead, `Everything is okay,' what happened?
A  Well, I think Howard told him to get back, and he wouldn't get back, so he just knocked him back.
Q  Knocked him back how?
A  Well, just hit him with a shotgun.

*96 Q  Where did he hit him?
A  Hit him in the shoulder. (Indicating.)
Q  Can you describe the manner in which he hit him?
A  He just hit him in kind of a sideways hit like that (Indicating.), just hit him there and it just went on up and hit him in the neck. I think the worst blow was on the shoulder.
* * * * * *
Q  All right, then what happened?
A  He went on by me; and best I can remember, he was telling this other boy to get back, and he acted like when he hit him with the shotgun that he was using it like a stick or something to knock him back with.
Q  Would you show us how he was using the shotgun.
A  Well, I would say just hit down in a way like that. (Indicating.)
Q  You saw Howard Whitehead come down with a shotgun on Howard Doss?
* * * * * *
A  Yes, sir.
Q  Do you know if the gun went off at that time?
A  Yes, sir.
Q  Do you know if anybody got hit?
A  Yes, sir.
Q  Who?
A  Mr. Doss.
* * * * * *
Q  Did the Defendant say anything?
A  I think he said, * * * `That boy is dead,' and he said, `I wouldn't have done it for nothing in the world.' He said he didn't mean to do it."
* * * * * *
Appellant testified on his own behalf that shortly after 10:00 o'clock on that terrible night, as he was preparing for bed, he heard "folks screaming and hollering and cussing" from the direction of Grant's trailer. He grabbed an old loaded shotgun and ran to see what was happening. His narration continues:
"A  As I ran down the road, I had kind of a funny feeling. I was right out in the broad open, you might say. So I shied over to the right where some cabbage trees and things were for a little protection. So as I got into the shadows, I fired the gun and I reversed it and fired it again. I took maybe three or four steps in between.
Well, I thought I heard Rocky's voice say, `That's Howard. We had better quiet down.' or something. It could have been Lynn that said it, but I thought it was Rocky. But, anyway, I realized then that I knew the voice and I wasn't scared or anything like that, and I walked on up towards the trailer, and by that time I had gotten within thirty-five feet of the trailer and Joe got to me first. He says, `I'm glad you come.' Says, `Them boys are crazy.' Says, `They're beating me to death.' Said, `They would beat me to death if you hadn't come.' Blood was running out of his face and all. I said, `Well, what are you doing here anyway?' He says, `Oh, I just come to see my cousin.' I says, `Yes, I bet.' And I walked a little closer. He says `You better not let them take you.' Said, `They'll beat both of us or kill both of us.' Why, I wasn't scared of them, as far as that goes, but I didn't know  didn't know this Lynn Grant because he hadn't been aworking for me but a little while, and he was well built, and, as I say, I really didn't know him, or I never met him up until just a few days before when my son hired him, but I knew that he was strong built and all and all country folks carry knives. In fact, I gave Doss his knife for a present.

* * * * * *
Well, Grant come up towards me, I guess trying to explain what happened. I says, `Just stand back.' I said, `Don't crowd me.' Well, he didn't even slow up or anything. *97 He just kept acoming. And I told him again, I says, `Just stand back.' Well, he just kept acoming. I whap  (Indicating.) I didn't knock him down. He didn't fall to the ground. He went part the way down. But I didn't intend to injure him or anything like that. I just hit him to let him know he just couldn't just run right over me, or, that is, you know, to get him back from me a little. Well, he didn't raise sand or wasn't down or I didn't offer to hit him again, or anything like that. It wasn't my intention to even hurt him. Well, I says to Rocky  Rocky had stayed back pretty well to his car and we were almost against his car at that time, which was about twentyfive feet, maybe thirty feet to the back of his car from the trailer. This pick-up had run up to the trailer and this car run to it immediately, and Rocky was astanding almost by the tail end of the car, and I says, `Rocky.' I says, `get your daughter and'  first I said, `Rocky, what is the trouble?' He says, `Oh, this Joe coming over here trying to get in Kim's pants.' I said, `Well, Rocky, I don't know.' I says, `I've been by here three times tonight and I haven't seen Joe here.' He says, `Well, I know.' Says, `We followed him over here.' So I says, `Well, Rocky,' I says, `get your daughter and go on home and we'll get this straightened up in the morning.' I meant that I would make Grant move or would get everything square to where there wouldn't be no trouble. He says, `No,' like that says, `No.' I says, `Well, Rocky,' I says, `Get Kim and carry her on to the house now,' I says, `because you all are drinking and,' I says, `She had no business to be here to begin with.' Now, see, that was the first time that Rocky had any idea that I thought that she ought not to be there, but I had seen a thing or two that made me think that she ought not to be there. And I would have explained to Rocky what I was talking about, but I didn't have time. Rocky says, `What you say,' and by that time I had hit him with that gun. I was standing there with the gun like this talking to Rocky, and Rocky was six foot seven or eight inches tall, had an awful long arm, and you might say I'm gun shy. I'm quick. I was just standing there with the gun, and Rocky says, `What you say?' He was going to say, `You said it was all right for my daughter to babysit.'
Q  We don't know what he was going to say, Mr. Whitehead. Please.
A  I believe that was what he was going to say. But by the time he done like that (Indicating.), I done hit him with the old gun. I was holding it just like that, and I done hit him just like that and that thing went off. I said, `My God. How did that happen?' Rocky fell on the floor and he never moved or anything. That's how quick it happened. And I wouldn't have had it happen for a million dollars. I would have done anything with the boy. In fact, I loved him like he was mine. I intended to even give him part of the business. I had even discussed it with different people."

* * * * * *
Obviously, as may be gleaned from the foregoing testimony of the only eye witnesses, appellant's defense was that the killing of "Rocky" Doss was either accidental, and thus falls within one of the categories of "excusable homicide"[1] or was "justifiable homicide" within the provisions of § 782.02, F.S.A. The court fully charged the jury on "excusable homicide," which, in essence, does involve issues of accident and misfortune, but the jury evidently resolved those issues against appellant. So excusable homicide is beyond our consideration here. However, the court did not fully charge the jury on "justifiable homicide," and this forms the basis for our reversal.
The case went to trial on an information charging second degree murder. Accordingly, the trial judge properly sought to charge the jury on the necessarily lesser included offense of manslaughter as condemned *98 by § 782.07, F.S.A. Under this section, manslaughter is defined as:
"The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder * * * shall be deemed manslaughter * * *." (Italics supplied.)
Thus defined the manslaughter condemned is clearly a residual offense, and it may be said therefore that one cannot tell what it is unless one knows what it isn't. Consequently, the express exclusions therein must be fully defined.[2]
Here, as we've noted, the court did sufficiently charge on "excusable homicide," but omitted a material part of the definition of "justifiable homicide." Now "justifiable homicide" is defined by F.S. 1969, § 782.02, F.S.A., as follows:
"1. Homicide is justifiable when committed by public officers and those acting by their command in their aid and assistance, either in obedience to any judgment of a competent court, or when necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty, or when necessarily committed in retaking felons who may have been rescued or who have escaped, or when necessarily committed in arresting felons fleeing from justice.
2. Homicide is justifiable when committed by any person in either of the following cases:
(a) When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person shall be; or
(b) When committed in the lawful defense of such person of his or her husband, wife, parent, grandparent, mother-in-law, son-in-law, daughter-in-law, father-in-law, child, grandchild, sister, brother, uncle, aunt, niece, nephew, guardian, ward, master, mistress or servant, when there shall be a reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished; or
(c) When necessarily committed in attempting by lawful ways and means to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace. (Italics supplied)
The trial court completely omitted to charge on the provisions of paragraph (1) of this section, and charged only on subsections (a) and (b) of paragraph (2) thereof, omitting to charge on subsection (c).
Concerning the first omission, we think the court was correct. While it is true that the court is bound to fully charge on the definitions of all crimes embraced within the crime charged or germane to the defense,[3] the provisions of paragraph (1) of § 782.02, supra, contemplate a special situation not possibly relevant in fact or law to the case here. It was properly omitted.
As to the omission of subsection (c) of paragraph (2) of that section, however, we think this was fatal since the omitted subsection unlike paragraph (1) aforesaid, does not contemplate a special situation and is otherwise always embraced within the "justifiable homicide" expressly excluded in the residual crime of manslaughter mentioned. It therefore constitutes part of the definition thereof and must be included in charge.[4]
*99 Additionally, from appellant's version of the tragedy, it was relevant to the exculpatory, argument, with which his defense is pregnant, that he was lawfully attempting to "keep the peace" and thus, pursuant to the rule relating to jury instructions on prima facie defenses as recognized in Bagley v. State,[5] should have been given for that reason.
True it is that the questions of the necessity for the killing and the lawfulness of the killer's actions and purpose go begging. But if applicable, other appropriate charges will aid the trier of fact in resolving these questions; and notwithstanding, for our purposes here in deciding whether it is necessary to charge on the omitted subsection, it must be kept in mind that such a charge is necessary not because it may be required to cover evidence supporting it but rather because it defines a material portion of the offense charged. In this context it isn't necessary that it be predicated upon admitted evidence; it is appropriate, indeed mandatory, otherwise.
We further observe that correlatively the provisions of § 782.11, F.S.A., are also applicable to this case. This section provides as follows:
"Whoever shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any other unlawful act, or after such attempt shall have failed, shall be deemed guilty of manslaughter." (Italics supplied)
As does several other sections of our statutes,[6] this section defines a substantive offense of manslaughter in and of itself even though it proscribes a special genre thereof which, unlike § 782.07, supra, does not constitute a necessarily lesser included offense within murder. But it may well constitute a lesser included offense if the facts and theory of defense warrant.[7] Here, for example, if the jury were fully charged on "justifiable homicide," and did not find that it was necessary for appellant to kill "Rocky" Doss in attempting to preserve the peace, and they were also fully charged under § 782.11, supra, and found that the killing was unnecessary, notwithstanding that it may have been committed in a lawful attempt to prevent an unlawful act,[8] then the offense would be manslaughter even if the killing were intentional or might otherwise be second degree murder. We conclude, therefore, that this omission was also error under the triable and alleged ultimate facts upon which the patent defenses herein were predicated.
In accord with its duty, then, to fully inform the jury on the law applicable both to the offense charged and to relevant defenses toward which there was some evidence, the court should have completely defined "justifiable homicide" as provided in § 782.02(2), F.S.A., and charged on the provisions of § 782.11, F.S.A. Since the first omission related to the substance of the crime charged, rather than to some evidentiary phase upon which a given charge may be appropriate if requested, we are not swayed by a failure either to properly object to such fatal omission or by a failure to specifically request a complete charge thereon.[9] The omission was necessarily prejudicial and misleading and requires a reversal.[10] As to the omission to charge on § 782.11, supra, while not *100 of itself reversible when no request is made therefore,[11] it is nonetheless error in our view and because it was relevant to a prima facie defense should have been given in an abundance of caution whether requested or not.
The judgment and 20 year prison sentence appealed from, therefore, should be, and they are, reversed and a new trial awarded.
Reversed.
PIERCE, C.J., and LILES, J., concur.
NOTES
[1] § 782.03, F.S.A.
[2] See, Hedges v. State (Fla. 1965), 172 So.2d 824.
[3] Hedges v. State, id.; Motley v. State, (Fla. 1945), 20 So.2d 798; Bagley v. State (Fla.App. 1960), 119 So.2d 400.
[4] id.
[5] n. 3, supra.
[6] See, e.g., §§ 782.08, 782.09, 782.10, 782.12, 782.13, 782.14, 782.15 and 860.01)
[7] Brown v. State (Fla. 1968), 206 So.2d 377.
[8] E.g., the offense of assault and battery or of trespass after warning, on both of which there was some evidence herein.
[9] See, Bagley v. State, n. 3, supra.
[10] See, e.g., Croft v. State, (1935), 117 Fla. 832, 158 So. 454; and Motley, n. 3, supra.
[11] See, e.g., Johnson v. State, (Fla.App. 1969), 229 So.2d 13; Jerry v. State, (Fla.App. 1968), 213 So.2d 440; and Burkhead v. State, (Fla.App. 1968), 206 So.2d 690.